[No. H039705. Sixth Dist. Mar. 30, 2017.]

THE PEOPLE, Plaintiff and Respondent, v.
MARCOS MENDOZA et al., Defendants and Appellants.

THE SUPREME COURT OF CALIFORNIA GRANTED REVIEW IN THIS MATTER
(see Cal. Rules of Court, rules 8.1105(e)(1)(B), 8.1115(e)) July 12, 2017, S241647.

## COUNSEL

James S. Thomson, under appointment by the Court of Appeal, for Defendant and Appellant Marcos Mendoza.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant Juan Ramirez.

David D. Martin, under appointment by the Court of Appeal, for Defendant and Appellant David Martell.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Catherine A. Rivlin and Moona Nandi, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GROVER, J.**—Maurillo Garcia died in August 2011 after receiving multiple stab wounds. Defendants Marcos Mendoza, David Martell, and Juan Javier Ramirez (collectively, defendants) appeal their convictions, following a joint trial, for second degree murder (Pen. Code, §§ 187, 189)[1] with gang enhancements (§ 186.22, subd. (b)) for killing Garcia.

On appeal, defendants briefed the case separately but many of their arguments overlap. All defendants argue the trial court erred by (1) excluding statements of Javier Barragan, a coperpetrator; (2) allowing the prosecutor to commit misconduct during the opening statement; (3) admitting unduly prejudicial evidence of gang-related intimidation; and (4) failing to properly instruct the jury regarding (a) voluntary intoxication, (b) the required mental state for guilt as an aider and abettor, and (c) the evidence necessary to prove the gang enhancement. All defendants argue that the prosecution presented insufficient evidence to support their gang enhancements.

Mendoza and Ramirez argue that the trial court erred by (1) allowing the prosecution to commit misconduct during its examination of John Deleone, a

---

[1] Unspecified statutory references are to the Penal Code.

witness for the prosecution; (2) admitting unduly prejudicial out-of-court statements by Mendoza and Ramirez; (3) admitting unduly prejudicial evidence of prior convictions to prove a " 'pattern of criminal gang activity' " (§ 186.22, subd. (e)); and (4) allowing the gang expert to show unduly prejudicial slides in the slideshow that accompanied his expert testimony.

Mendoza argues that the prosecution provided insufficient evidence to corroborate accomplice Tommy Gonzalez's testimony about Mendoza's involvement in the homicide.

Martell argues that the prosecution presented insufficient evidence to support his guilt and contends that his trial counsel provided ineffective assistance by failing to present a plausible theory of Martell's innocence and by failing to properly cross-examine a witness.

All defendants argue the foregoing errors were cumulatively prejudicial.

In our original unpublished opinion, we found no prejudicial error, modified the judgments to specify a 15-year minimum parole eligibility (§ 186.22, subd. (b)(5)), and affirmed the judgments as modified.[2]

All defendants petitioned for rehearing. Ramirez argues, among other things, that Proposition 57, the Public Safety and Rehabilitation Act of 2016, should be applied retroactively to his case because he was 16 years old at the time of the offense and his judgment was not final when voters approved Proposition 57 at the November 2016 general election. We granted rehearing to determine whether Ramirez was entitled to relief under Proposition 57.

■ In the published portion of this opinion, we conclude that Proposition 57 does not apply retroactively to Ramirez's case. In the unpublished portion (pt. II.), we adhere to our original analysis and again find no prejudicial error; however, we will direct that a new abstract of judgment be prepared for each defendant to note a 15-year minimum parole eligibility date based on Penal Code section 186.22, subdivision (b)(5).

## I. TRIAL COURT PROCEEDINGS

### A. *The Homicide*

The jury heard two accounts of Maurillo Garcia's death. Tommy Gonzalez, an accomplice, provided one account. Tommy testified that he was drinking

---

[2] The same day we filed the original opinion, we denied a petition for writ of habeas corpus filed by Martell's appellate counsel that alleged ineffective assistance of trial counsel. (See Cal. Rules of Court, rule 8.387(b)(2)(B).)

with fellow Norteño gang members in the front yard of his house when a suspected Sureño gang member started spray-painting on the street by the house, leading Tommy and several others to chase down and assault the Sureño.[3] Salvador Rivas, an eyewitness, provided a second account. He testified that he was at a party at his father's house when he saw a group of five to seven men run toward and assault a man who was spray-painting in the street.

### 1. Coperpetrator Tommy Gonzalez's Account

Tommy Gonzalez testified for the prosecution as part of a plea agreement whereby the prosecutor agreed to reduce his murder charge related to Maurillo Garcia's death to voluntary manslaughter in return for his truthful testimony at defendants' trial. Tommy lived at 436 Ezie Street with his mother, his brother Raymond Gonzalez, Jr. (Raymond Jr.), his nephew Raymond Gonzalez III (Raymond III), and others. Tommy had been a Norteño gang member since he was nine years old. His nickname was Beast because he fought frequently when he was incarcerated for a juvenile offense.

Tommy's friend Javier Barragan called him in the afternoon on August 27, 2011, and asked if he could come "kick back" at Tommy's house. Barragan arrived around 6:00 or 7:00 p.m. with defendants Mendoza and Ramirez. Tommy knew Mendoza by the nickname Travieso and Ramirez by the nickname Smiley. Tommy testified that Barragan, Mendoza, and Ramirez were all part of a Norteño subset called San Jose Unidos. They all drank beers in the front yard and were eventually joined around 8:00 p.m. by defendant Martell, known to Tommy as Guerro. Tommy had not met Martell before, but Barragan assured him that Martell was " 'good people.' " At trial, Tommy identified all three defendants as the people who came to his house on August 27.

Around 10:00 p.m., Tommy saw a person (later identified as Maurillo Garcia) who looked like a Sureño gang member walk past the house twice within two minutes. Garcia walked to a stop sign where Richdale Avenue dead-ends into Ezie Street and spray-painted something on the ground while saying "Sur Trece Putos Calle." Tommy perceived Garcia's actions as a challenge. Tommy ran toward Garcia, followed closely by Martell and then more distantly by Mendoza, Ramirez, and Barragan. Tommy swung at Garcia but missed; Garcia cut Tommy's stomach with a screwdriver. Tommy backed up and "everybody jump[ed] on" Garcia. Mendoza and Ramirez were punching Garcia. Tommy did not see Martell or Barragan do any punching or

---

[3] Meaning no disrespect, we refer to members of the Gonzalez family by their first names because multiple members of the Gonzalez family were involved in this case.

kicking. Tommy and the others ran back to his mother's Cadillac that was parked in front of 436 Ezie Street and drove away.

## 2. Witness Salvador Rivas's Account

Salvador Rivas testified that on the night of the homicide he was attending a party at his father's house on Ezie Street, which faces the intersection of Richdale Avenue and Ezie Street. Rivas was in the garage and the garage door facing the street was open. Jose Garcia (Maurillo Garcia's brother, whom we refer to as Jose for clarity) walked by the house and Rivas's father invited Jose to have a beer. Rivas noticed Maurillo Garcia spray-painting on the street near a stop sign. Five to seven men came from the direction of 436 Ezie Street and chased Garcia.[4] Rivas heard someone yell, " 'Get him' " and " 'Norte.' "

Rivas testified that Garcia ran but was tripped and fell, at which point all of the men who chased him started beating him. Rivas stated that everyone participated in the assault. Garcia managed to get up for a moment but the men knocked him down again and continued to beat him. Rivas testified that the men mostly kicked Garcia but some punches were also thrown. He could not clearly see any weapons. He saw something shiny but acknowledged it could have been a belt buckle. Rivas also could not see any of the attackers well enough to identify them in court. The attack lasted about 30 seconds. The men went back toward 436 Ezie Street and left in a Cadillac. One of the men might have left separately in a van.

Rivas described the assailants as Hispanic males between 20 and 30 years old. He acknowledged that it was not very light outside the night of the homicide, that there were no streetlights in the area of Richdale where the homicide took place, and that there were some cars and trucks parked in the driveway of his father's house. He estimated his vantage point in the garage was 60 yards from the victim.

## B. Defendants Charged with Murder

Defendants were each charged in a single felony information with murder (§ 187), with a special allegation that each committed the murder for the benefit of, at the direction of, or in association with a criminal street gang

---

[4] As relevant to one of Martell's appellate arguments, Rivas's testimony at trial regarding the chase was somewhat inconsistent. On direct examination, Rivas testified that one male led the chase and was followed by the remaining people. On cross-examination, Rivas testified that two men led the chase but that one of them was slightly in front of the second, with the rest further behind the second man.

(§ 186.22, subd. (b)(1)(C)).[5] Ramirez, who was 16 on August 27, 2011, was charged as an adult. (Welf. & Inst. Code, former § 707, subds. (b), (d)(1); Stats. 2008, ch. 179, § 236, p. 903.) The information alleged that Martell had a prior juvenile adjudication that qualified as a strike. (§ 667, subds. (b)–(i); Welf. & Inst. Code, former § 707, subd. (b); Stats. 2008, ch. 179, § 236, p. 903.)

### C. Trial

Trial commenced in February 2013. Defendants moved for a mistrial after the prosecutor's opening statement, alleging that he argued facts that would not be introduced into evidence, vouched for prosecution witnesses, denigrated defendants, and committed *Griffin* error through improper reference to Ramirez's silence when interrogated after his arrest. (*Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].) The court denied the motion.

#### 1. Additional Testimony About the Homicide

Raymond Jr. testified that Barragan, Martell, and Ramirez were drinking with Tommy in the front yard of 436 Ezie Street on the evening of the homicide. When the prosecutor pointed to Mendoza in the courtroom and asked if he was also there, Raymond Jr. responded, "I think so." Tommy dropped Raymond Jr. off at a clubhouse in San Jose around 7:00 or 8:00 p.m. on August 27 and Raymond Jr. did not return home until after 2:00 a.m. On cross-examination, Raymond Jr. acknowledged that he was a Norteño when he was younger but said he "grew up out of it." He also acknowledged that the district attorney's office had paid to relocate his family in return for his cooperation and that he had never told the police that Tommy was at the house on the night of the homicide.

Raymond Jr.'s son, Raymond III, also testified. Raymond III testified that he stayed inside the house at 436 Ezie Street the whole night on August 27. Raymond III was on juvenile probation when the homicide occurred. He did not want to testify. He denied that any of the defendants were at 436 Ezie Street the night of the homicide. He claimed that he lied to the police over the course of several interviews, telling them multiple versions of what happened that night and providing fictitious descriptions of suspects. He acknowledged testifying at Martell and Ramirez's preliminary hearing that five men came over to the house the night of the homicide, that he had seen those men before, and that they eventually left in his grandmother's Cadillac.

---

[5] Ramirez and Martell were held to answer following a joint preliminary hearing. Mendoza was indicted by a grand jury. Defendants' cases were eventually consolidated.

He denied that his Uncle Tommy was at the house the night of the homicide, and said his father, Raymond Jr., had been there but had left at some point.

San Jose Police Detective Merlin Newton testified about Raymond III's statements to him in the early morning the night of the homicide and during subsequent interviews. The night of the homicide, Raymond III described three suspects to Newton: a man with the nickname Big Tone; a man with "S.J." tattooed on his chest; and a 16 year old. Newton testified that Raymond III made different statements at different interviews but that at some point he told Newton that he had been in the front yard of the house the night of the homicide and saw five Norteño men run after a person who was spray-painting on Richdale Avenue. Raymond III reportedly told Newton that the men ran out of Raymond III's view and eventually returned to the house before driving away in his grandmother's Cadillac.

Newton testified that, over the course of four interviews, Newton showed Raymond III pictures of individuals (including defendants) and asked Raymond III if any of them were at the house the night of the homicide. Raymond III was inconsistent regarding whether Martell had been there the night of the homicide but at some point he identified a picture of Martell as a suspect during one of the interviews. Raymond III identified a picture of Ramirez as the 16 year old he had described as being present the night of the homicide. He also identified pictures of three people who were never charged. Raymond III never identified pictures of Tommy or Mendoza.

### 2. Defendants' Flight the Night of the Homicide

#### a. Tommy's Testimony

Tommy testified that he drove the Cadillac away from 436 Ezie Street with Mendoza, Ramirez, Martell, and Barragan. While they were driving, Mendoza reportedly stated, " 'I got that nigga,' " and also stated that he " 'booked him' " 14 or 15 times. Ramirez said, "I was carving that fool's face," and then complained to Mendoza that "you fucking cut me, bitch." Mendoza responded that Ramirez "shouldn't be getting in my way when I'm handling my business." Ramirez had a deep cut on his hand.

Tommy testified that Barragan told him to drive to Peckerwood's (later identified as John Deleone's) apartment in the Thornbridge Apartments, which were near Ezie Street. Barragan asked for the weapons and Tommy reportedly saw a kitchen knife that had been used by Mendoza as well as a

screwdriver.[6] At some point, Martell said that he had dropped his phone somewhere. Tommy parked, they wiped down the car, and he and Barragan went upstairs to Deleone's apartment. Tommy or Barragan handed the weapons to Deleone, Deleone's girlfriend took them into the bathroom, and then "you hear the water running."

Tommy testified that Barragan's brother Junior picked the group up from Deleone's apartment about 10 minutes after they arrived and drove them to Barragan's mother's house near the Oakridge Mall. The group stayed at Barragan's mother's house for a short time. Martell left separately before the others. Tommy, Barragan, Mendoza, and Ramirez were picked up by someone with the nickname Creeper and driven to Milpitas. When they arrived in Milpitas, a "cop car pulled in right behind us, and we got off and took off running."

### b. *John Deleone's Testimony*

John Deleone testified in return for use immunity and an agreement that the prosecutor would resolve pending drug charges against Deleone with drug rehabilitation and a county jail sentence. Deleone testified that in August 2011 he was a heavy methamphetamine user, using up to one-eighth ounce per day. His girlfriend was also a heavy methamphetamine user. He acknowledged at trial that he had a poor memory due to his prior drug use. He knew Barragan and also knew Mendoza, but only by the nickname Travi. He knew Ramirez by the nickname Smiley and claimed to be like a big brother to him. Based on refreshed recollection from Deleone's testimony at Mendoza's grand jury proceedings, Deleone testified that Barragan was a Norteño who was affiliated with San Jose Unidos. Deleone acknowledged that he identified Ramirez at the grand jury hearing as a member of San Jose Unidos but testified at trial that "I might have misspoke when you asked me that question."

Deleone testified that Barragan and Smiley came to his apartment on August 27 around 11:00 p.m. with a third person whose identity Deleone could not remember. The prosecutor purported to refresh Deleone's recollection by reading the following out loud from the grand jury transcript: " 'What happens on this occasion? Who came over on this occasion?' [¶] Your answer was: [¶] 'I remember Javi, Javier, Juan, and somebody else. I don't remember who the other person—I think it was Travi, but I couldn't be certain.' "[7] Deleone acknowledged at trial that he had also told investigating officers that the third person could have been Beast (Tommy's nickname). Deleone did not see Martell that night.

---

[6] Tommy acknowledged on cross-examination that he had told the police during previous interviews that he never saw the weapons.

[7] The court overruled defense objections to the prosecutor's method of refreshing Deleone's recollection.

Deleone testified that the people who came to his apartment that night were agitated. Ramirez reportedly told Deleone that he hit a guy with a Phillips-head screwdriver five to 10 times and demonstrated by making stabbing motions on a couch or a pillow. When asked whether the people who came to his house brought weapons, Deleone stated that they brought a knife, a box cutter, and a Phillips-head screwdriver. The court later struck that testimony when Deleone clarified that he never saw weapons that night and instead only saw a black sweatshirt wrapped around certain items that Barragan brought to the apartment. Deleone's girlfriend took the black sweatshirt to a sink and turned on the water, at which point Deleone "could hear all the stuff rattling around in the sink."[8] Deleone testified that it seemed like the others were trying to shift the blame for the stabbing to Ramirez.

### 3. Tommy Flees, Is Arrested in Texas, and Cooperates with Police

Tommy testified that he moved to Texas after the homicide, where he was arrested in March 2012 for resisting arrest. San Jose police detectives came to Texas and interrogated Tommy regarding the Garcia homicide. Tommy testified that the officers played a short portion of a videotaped interview between Barragan and the police, during which Barragan appeared to be trying to blame everything on Tommy.[9] Faced with that interview, Tommy decided to cooperate with the police and tell them his version of the homicide.

On cross-examination, Tommy acknowledged that he had an extensive criminal history and that he cooperated with the police to avoid a possible life sentence. He also acknowledged that he might not have positively identified Martell during the initial Texas interview and might have stated more generally that a picture of Martell looked familiar.[10]

### 4. Cell Phone, DNA, and Fingerprint Evidence

A San Jose police officer testified that police found a cellular phone on Richdale Avenue near the intersection of Richdale and Ezie Street the night of the homicide. The phone was registered to Martell's mother and contained a photograph of Martell that looked like it was taken by Martell "holding out

---

[8] After the court struck the testimony about weapons, the prosecutor referred to the items in the sweatshirt as weapons two more times and the trial court sustained defense objections each time. The court later denied a defense mistrial motion based on the prosecutor's conduct.

[9] The court denied a defense motion to admit statements from the Barragan interview.

[10] Merlin Newton, one of the San Jose detectives who interviewed Tommy in Texas, testified at trial that Tommy identified Martell during the Texas interrogation as the person who lost his phone the night of the homicide.

his cell phone and taking a photo of himself." The clip on the phone's case that would secure it to a pocket was loose.

The prosecution introduced information about the general locations of various cellular phones based on call activity on the night of the killing. San Jose Police Detective Juan Vallejo testified that cellular phone calls generally connect through the nearest cellular tower to the phone's location. The San Jose Police Department employee who created a trial exhibit mapping cellular phone activity testified that a phone's location cannot be precisely identified based on its connection with a cellular tower and that if a tower is busy a phone can connect through a different tower.

Detective Vallejo testified that on August 27, calls from Martell's phone connected through a cellular tower in the San Francisco area before 8:00 p.m. and through towers in San Jose between 8:20 p.m. and 8:23 p.m. No further calls were made from that phone after 8:23 p.m. that night. Data for a phone number associated with Tommy showed that the phone connected with a tower near the crime scene from 6:22 p.m. until 10:02 p.m., through a tower south of the crime scene and closer to Deleone's apartment at 10:41 p.m., through a tower southwest of the crime scene near Barragan's mother's house at 10:58 p.m., and through a tower in Milpitas between 2:51 and 4:03 a.m. on August 28. Data for a phone number associated with Mendoza were generally consistent with Tommy's in both time and location on August 27 and the early morning of August 28. A phone number associated with Ramirez showed phone calls made through a tower in Milpitas around the same time as some of Tommy's calls.

The jury also heard testimony regarding fingerprint and DNA evidence. A fingerprint on a beer can found in the backyard at 436 Ezie Street matched Martell. Martell's DNA was found on a cigarette located in the front yard of 436 Ezie Street. A fingerprint on a different beer can found in the backyard of 436 Ezie Street matched Mendoza. One of Mendoza's fingerprints matched a fingerprint found on a beer can in the front driveway of 436 Ezie Street. Mendoza's DNA was found on a swab collected from that same beer can. Ramirez's DNA was present in dried blood taken from the exterior rear passenger side door of a gray Cadillac the police found on August 31 at the Thornbridge Apartments.

### 5. *Victim Information and Autopsy Results*

A crime scene investigator testified that Garcia had "S.U.R." tattooed in capital letters on his left arm as well as a tattoo of a man's head wearing a bandana with "V.S.T." and "13" written on it. He also had a star to the left of his left eye and three dots to the right of his right eye.

Dr. Joseph O'Hara testified as an expert in pathology and cause of death about the autopsy he performed in the case. Garcia suffered 15 stab wounds to his face, chest, abdomen, thighs, arms, right foot, and lower back. Among the most severe stab wounds were a four and one-half-inch deep wound to the chest; a four-inch deep wound to the abdomen that perforated his liver; a three-inch deep wound to the chest that collapsed a lung; and a five-inch deep wound to the armpit. Each of those four stab wounds could have been independently fatal without medical treatment. Though he could not be certain, Dr. O'Hara testified that the structure of the stab wounds indicated the possibility that two weapons were used: one with a single-edged blade and another with a double-edged blade. There were no round puncture wounds, as would be expected if a Phillips-head screwdriver was used as a weapon. Garcia suffered three incised wounds (wounds that are longer than they are deep) and multiple blunt force injuries, including contusions, abrasions, and lacerations. Dr. O'Hara opined that the cause of death was multiple stab wounds of the head, trunk, and extremities.

### 6. Statements by Defendants

Detective Vallejo testified about interrogating Martell on August 31 with Detective Newton.[11] Martell was read his *Miranda*[12] rights and asked about the night of the homicide. Martell claimed he had been in San Francisco watching a football game that day and returned to the San Jose area around 7:30 or 8:00 p.m. Martell claimed he was dropped off at a grocery store near Ezie Street, walked to the house of his cousin (who was not home), and then walked to his aunt's house where he stayed the rest of the night. Martell said he lost his phone that day and thought he dropped it while walking from the grocery store to his cousin's house. The prosecutor asked Vallejo whether Martell admitted being a Norteño when he was younger, and Vallejo testified that Martell "said back when he was a juvenile, he was involved with gangs." Martell repeatedly denied being on Ezie Street on August 27 and told the police he did not know anything about the homicide. Detective Vallejo testified that at the time of the interview Martell had scratches and abrasions on his hands and a large "S.J." tattooed on his stomach.

Detective Newton testified about interrogating Ramirez in September 2011 after arresting him and reading him his *Miranda* rights. Ramirez had what Newton described as a healing wound on his right ring finger. Ramirez said he was familiar with Ezie Street and had been there on one afternoon about two months earlier. He identified a picture of Barragan as a friend but claimed not to know his name. Ramirez denied being a Norteño, stating "No,

---

[11] The video recording of the interrogation and a transcript were admitted into evidence at trial after certain information was redacted.

[12] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).

I just hang out with," before trailing off. He steadfastly denied being on Ezie Street on August 27 and also denied participating in any sort of assault that might have occurred there.

The jury heard statements made by Mendoza from three sources: a noncustodial interview; a booking interview; and text messages from Mendoza's cellular phone. Detective Newton conducted a noncustodial interview with Mendoza at Mendoza's workplace in March 2012.[13] At the noncustodial interview, Mendoza stated that he had heard of Ezie Street but had never been there. He denied being in a gang. When asked if he "claimed Northern," Mendoza responded "[j]ust Northern, yeah." Newton showed Mendoza pictures of Martell, Barragan, and possibly other suspects; Mendoza denied knowing any of them. Mendoza had a large "U" tattoo that extended from the top of his chest down to his belly button. He also had "Unidos" tattooed across his stomach. Newton testified that Mendoza told him those tattoos were in support of a college team he liked, the Utah Utes.

When Mendoza was booked into the county jail after his arrest, correctional officer Gilbert Rios conducted a classification interview with Mendoza. Rios testified that all inmates are asked if they associate with a gang when they are booked into the county jail. Inmates were told that the gang association question was for their safety and that their response would remain confidential. Rios testified that if an individual indicated they would rather be housed with members of a certain gang, that would be treated as an admission. Rios's notes indicated that Mendoza "admitted Northerner."

The trial court also admitted text messages from Mendoza's phone relating to drug sales.

### 7. Gang Expert

San Jose Police Detective Chris Gridley testified as an expert regarding gang crimes. Gridley testified about Norteños generally, described prior convictions offered to prove a pattern of criminal gang activity, offered opinions about defendants' gang affiliations, and opined that the murder was gang related. As Gridley's testimony is relevant to several issues on appeal, we will discuss it in greater detail in the nonpublished portion.

### 8. Evidence of Intimidation

Evidence suggesting intimidation of witnesses was admitted over defendants' objections. Deleone testified that he was punched in the mouth by an

---

[13] After minor redactions, the audio recording of Mendoza's noncustodial interview was admitted into evidence over his relevance objection.

inmate while in custody in the Santa Clara County Jail in May 2012. Deleone was told that the attack had been ordered by "the Nortenos" because Deleone had made statements to the police related to defendants' case.[14] He was "[s]omewhat" fearful for his life afterward and was moved into protective custody. Deleone asked the district attorney's office to relocate him and also asked for an escort to and from testifying at defendants' trial because he feared for his life.

Tommy testified that at some point between the homicide and his arrest in Texas, Barragan's brother Junior told Tommy that his nephew and his brother (presumably meaning Raymond Jr. and Raymond III) "are snitching on me and on everybody" and asked Tommy if he knew where they were.[15] Tommy withheld the information because he feared for both his and his family's safety.

Salvador Rivas testified that his home was vandalized in October 2011 when someone spray-painted graffiti on his garage and his car. Among the graffiti was "XIV." Rivas feared for his family's safety and believed the graffiti was related to him talking to the police because the graffiti occurred within two hours after he received a subpoena to testify in defendants' case. He remained fearful at trial.

### 9. Defense Case

Though technically called by the prosecution, Martell's attorney sought favorable testimony from Randy Carrasco, whose grandmother was Martell's grandmother's partner. Carrasco worked with Martell as a furniture mover and testified that it was common for employees to get scratches while at work.

Defense investigator James O'Keefe testified based on a site visit that the approximate distance between where Garcia was stabbed and the garage at 452 Ezie Street was 198 feet, or 66 yards. He also testified, based on an Internet search, that there would have been almost no light from the moon on the night of the homicide.

### D. Jury Instructions, Verdict, and Sentencing

Among other instructions, the court read versions of CALCRIM Nos. 252 (general v. specific intent), 400 (aiding/abetting generally), 401

---

[14] The hearsay statement was admitted for the limited purpose of showing Deleone's state of mind.

[15] The hearsay statement was admitted for the limited purpose of showing the effect on the listener (Tommy).

(aiding/abetting intent), 403 (natural and probable consequences), 520 (murder), 875 (assault with a deadly weapon), 915 (simple assault), 1401 (gang enhancement) and 3426 (voluntary intoxication).

The jury deliberated for several days, and ultimately found all defendants guilty of the lesser included offense of second degree murder and found the gang allegations true. Martell waived jury on the strike allegation, which the court found true after a hearing.

The trial court sentenced each defendant to an indeterminate term of 15 years to life for murder. The court purported to stay the sentence for the gang enhancements. (See § 186.22, subd. (b)(1)(C).)[16] The court granted Martell's *Romero*[17] motion to strike the true finding on the strike allegation.

## II. ISSUES RAISED IN THE ORIGINAL APPEALS*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. NO RETROACTIVE APPLICATION OF
## PROPOSITION 57

We granted rehearing and asked the parties to submit supplemental briefing regarding whether Proposition 57 had any effect on Ramirez's appeal. Ramirez argues that he is entitled to relief under Proposition 57 because (1) the voters intended to apply Proposition 57 to nonfinal cases; (2) *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948] (*Estrada*) compels retroactive application of Proposition 57; and (3) the failure to apply Proposition 57 retroactively would violate his California and federal constitutional rights to equal protection and due process.

---

[16] The minute order states the stay was "purs. to Johnson case," presumably meaning *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1237, 1239 [135 Cal.Rptr.2d 848] [finding § 186.22, subd. (b)(1)(C) inapplicable to second degree murder indeterminate sentence because § 186.22, subd. (b)(5) applies to " 'a felony punishable by imprisonment in the state prison for life' " and "requires that the defendant serve a minimum of 15 calendar years before being considered for parole"].

[17] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 [53 Cal.Rptr.2d 789, 917 P.2d 628].

*See footnote, *ante*, page 327.

### A. Procedural Background and Proposition 57

█ Ramirez, who was 16 years old when the homicide occurred, was charged by direct filing in adult court.[26] At that time, Welfare and Institutions Code former section 707, subdivision (d)(1) allowed a prosecutor to bypass the juvenile court and directly file certain charges against a minor in adult court. (Stats. 2008, ch. 179, § 236, p. 903.) Specifically, a prosecutor could file an accusatory pleading directly in adult court against a minor, like Ramirez, who was both 16 years of age or older and accused of committing certain specified offenses (including murder). (Welf. & Inst. Code, former § 707, subds. (d)(1), (b)(1); Stats. 2008, ch. 179, § 236, p. 903.)

The voters approved Proposition 57 at the November 8, 2016, General Election; it took effect the next day. (Cal. Const., art. II, § 10, subd. (a).) Proposition 57 amended the Welfare and Institutions Code to mandate that any allegation of criminal conduct against any person under 18 years of age be commenced in juvenile court, regardless of the age of the juvenile or the severity of the offense. (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, pp. 141–145.) As amended by Proposition 57, Welfare and Institutions Code section 707, subdivision (a)(1) now specifies that the sole mechanism by which a minor can be prosecuted in adult court is through a motion by a prosecutor to transfer the case from juvenile court to adult court.[27] In response to a motion to transfer, "the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction," considering the "degree of criminal sophistication exhibited by the minor"; whether "the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"; the "minor's previous delinquent history"; the success "of previous attempts by the juvenile court to rehabilitate the minor"; and the "circumstances and gravity of the offense alleged in the petition to have been committed by the minor."[28] (§ 707, subd. (a)(2)(A)–(E).)

Proposition 57 also changed parole eligibility for both adults *and* juveniles tried in adult court. It added section 32 to article I of the California Constitution, which provides: "Any person convicted of a nonviolent felony

---

[26] As we will be differentiating between courts of criminal jurisdiction and juvenile courts, we will refer to courts of criminal jurisdiction as adult courts.

[27] Specifically, Welfare and Institutions Code section 707, subdivision (a)(1) now provides: "In any case in which a minor is alleged to be a person described in Section 602 by reason of the violation, when he or she was 16 years of age or older, of any felony criminal statute, or of an offense listed in subdivision (b) when he or she was 14 or 15 years of age, the district attorney . . . may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction."

[28] Proposition 57 also amended Welfare and Institutions Code section 602, but those amendments are not relevant to this appeal. (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, pp. 141–142.)

offense and sentenced to state prison shall be eligible for parole consideration after completing the full term for his or her primary offense." (Cal. Const., art. I, § 32, subd. (a)(1).)

Proposition 57 contains uncodified sections, some of which are relevant to Ramirez's contentions. Section 2 states that the purpose and intent of the proposition was, among other things, to "[s]ave money by reducing wasteful spending on prisons"; "[s]top the revolving door of crime by emphasizing rehabilitation, especially for juveniles"; and "[r]equire a judge, not a prosecutor, to decide whether juveniles should be tried in adult court." (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, p. 141 (Voter Information Guide).) Section 5 states that the act "shall be broadly construed to accomplish its purposes." (*Id.*, at p. 145.) Section 9 states that the act "shall be liberally construed to effectuate its purposes." (*Id.*, at p. 146.)

### B. *Text and History of Proposition 57 Do Not Support Retroactivity*

■ Whether the voters intended Proposition 57 to apply retroactively is a question of law to which we apply our independent judgment. (*People v. Arroyo* (2016) 62 Cal.4th 589, 593 [197 Cal.Rptr.3d 122, 364 P.3d 168] (*Arroyo*).) When interpreting a voter initiative, we apply the same rules that govern statutory construction. We first look to the language of the enactment, giving the words their ordinary meaning. If the law is ambiguous, we refer to other sources of voter intent, including the arguments and analyses contained in the official voter information guide. (*Ibid.*)

■ "Whether a statute operates prospectively or retroactively is, at least in the first instance, a matter of legislative intent. When the Legislature has not made its intent on the matter clear with respect to a particular statute, the Legislature's generally applicable declaration in section 3 provides the default rule: 'No part of [the Penal Code] is retroactive, unless expressly so declared.'" (*People v. Brown* (2012) 54 Cal.4th 314, 319 [142 Cal.Rptr.3d 824, 278 P.3d 1182] (*Brown*).) We are "cautious not to infer retroactive intent from vague phrases and broad, general language in statutes." (*Ibid.*)

The text of Proposition 57 contains no express statement of intent regarding prospective or retroactive application. Ramirez argues that retroactive intent can be inferred from broadly and liberally construing the initiative's stated purposes of saving money by reducing spending on prisons and requiring judges rather than prosecutors to decide whether juveniles should be tried in adult court. (Citing Voter Information Guide, *supra*, text of Prop. 57, p. 141.) But even broadly construed, none of the stated purposes provide a reference to timing from which retroactive intent can be inferred. In fact, there is arguably textual support for an inference of *prospective* intent. One

stated purpose is to require judges rather than prosecutors to decide "whether juveniles *should be* tried in adult court." (Voter Information Guide, *supra*, text of Prop. 57, § 2, p. 141, italics added.) That statement suggests an intent that Proposition 57 apply only to cases that have not already been tried. At most, the text of Proposition 57 is ambiguous.

Because the text of the initiative is arguably ambiguous, we look to the ballot materials to determine whether they shed light on the voters' intent. (*Arroyo, supra,* 62 Cal.4th at p. 593.) Ramirez points to several statements from the argument in favor of Proposition 57, that he argues suggest the voters intended to apply Proposition 57 retroactively: "Prop. 57 focuses resources on keeping dangerous criminals behind bars, while rehabilitating juvenile and adult inmates and saving tens of millions of taxpayer dollars"; "Prop. 57 focuses our system on evidence-based rehabilitation for juveniles and adults because it is better for public safety than our current system"; "Prop. 57 saves tens of millions of taxpayer dollars by reducing wasteful prison spending, breaks the cycle of crime by rehabilitating deserving juvenile and adult inmates, and keeps dangerous criminals behind bars"; "Requires judges instead of prosecutors to decide whether minors should be prosecuted as adults, emphasizing rehabilitation for minors in the juvenile system"; and "Evidence shows that the more inmates are rehabilitated, the less likely they are to re-offend. Further evidence shows that minors who remain under juvenile court supervision are less likely to commit new crimes. Prop. 57 focuses on evidence-based rehabilitation and allows a juvenile court judge to decide whether or not a minor should be prosecuted as an adult." (Voter Information Guide, *supra*, argument in favor of Prop. 57, p. 58; *id.*, rebuttal to argument against Prop. 57, p. 59.)

Though the foregoing passages express voter intent to focus on rehabilitation, they are silent as to intent regarding retroactivity. And, like the statement of intent from Proposition 57 we have already discussed, the last two of those passages are susceptible of the same inference of *prospective* intent. Both state that judges should decide whether minors "should be prosecuted," suggesting an intent that the law apply only to future prosecutions.

In sum, we find that the voters did not make their intent clear regarding retroactive application in the text of Proposition 57 nor can we clearly discern their intent from the voter information guide, meaning that we must follow Penal Code section 3 and apply Proposition 57 prospectively unless the *Estrada* rule applies. (*Brown, supra,* 54 Cal.4th at p. 319.)

### C. *The* Estrada *Rule Does Not Apply*

Ramirez argues that retroactive application of Proposition 57 is compelled by the *Estrada* rule, which is a judicially created exception to the general Penal Code section 3 presumption that new statutes apply prospectively.

#### 1. *The* Estrada *Rule*

█ Even in the absence of voter intent to apply a proposition retroactively, the *Estrada* rule provides a "contextually specific qualification to the ordinary presumption" of prospective application. (*Brown, supra*, 54 Cal.4th at p. 323, citing *Estrada, supra*, 63 Cal.2d 740.) When the electorate (or Legislature) amends "a statute to reduce the punishment for a particular criminal offense," the *Estrada* rule provides an inference that the voters "intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*Brown*, at p. 323.) That conclusion is based on the "premise that ' "[a] *legislative mitigation of the penalty for a particular crime* represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law." ' " (*Ibid.*, quoting *Estrada*, at p. 745, italics added by *Brown*.)

*Brown* is instructive regarding application of the *Estrada* rule. *Brown* involved a legislative amendment to section 4019 that temporarily increased the rate at which presentence custody credits were calculated. (*Brown, supra*, 54 Cal.4th at pp. 317–319.) Brown was sentenced to prison before the amendment but argued, based on the *Estrada* rule, that the amendment should apply retroactively to him because his judgment was not yet final when the amendment became effective. (*Brown*, at pp. 318–319, 323.) The *Brown* court decided the *Estrada* rule did not apply. It reasoned that unlike a legislative mitigation of the penalty for a particular crime, "a statute increasing the rate at which prisoners may earn credits for good behavior does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent." (*Id.* at p. 325.) The court noted that section 4019 did not alter the penalty for a crime at all, it merely "addresses *future conduct* in a custodial setting by providing increased incentives for good behavior." (*Brown*, at p. 325, original italics.)

The *Brown* court rejected an argument that the *Estrada* rule should "apply more broadly to any statute that reduces punishment in any manner." (*Brown, supra*, 54 Cal.4th at p. 325.) The court reasoned that such a broad application would expand the *Estrada* rule to such an extent as to swallow the general section 3 presumption of prospective application. (*Brown*, at p. 325.) That

expansion would run counter to the court's interpretation of the *Estrada* rule "not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown*, at p. 324.) The court also explained that broadening the *Estrada* rule to apply to the section 4019 amendments would not "represent a logical extension of *Estrada*'s reasoning." (*Brown*, at p. 325.) While acknowledging that "a convicted prisoner who is released a day early is punished a day less," the court noted that "the rule and logic of *Estrada* is specifically directed to a statute that represents ' "a legislative mitigation of the *penalty for a particular crime*" ' [citation] because such a law supports the inference that the Legislature would prefer to impose the new, shorter penalty rather than to ' "satisfy a desire for vengeance." ' " (*Ibid.*, italics added by *Brown*.)

## 2. *Analysis*

Ramirez argues that the *Estrada* rule applies because Proposition 57 "specified that 'different treatment' as a juvenile was sufficient to meet . . . 'the legitimate ends of the criminal law.' " (Quoting *Brown, supra*, 54 Cal.4th at p. 323.) The fundamental problem with Ramirez's argument is that—unlike every case he cites where a court found that the *Estrada* rule applied[29]— Proposition 57 does not mitigate the penalty for a particular crime. As the court emphasized in *Brown*: "We based this conclusion [that the *Estrada* rule requires retroactive application of statutes that reduce punishment for a particular offense] on the premise that ' "[a] *legislative mitigation of the penalty for a particular crime* represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of

---

[29] Other than *Estrada* and *Brown*, Ramirez cites: *People v. Francis* (1969) 71 Cal.2d 66, 75–78 [75 Cal.Rptr. 199, 450 P.2d 591] (defendant entitled to resentencing on controlled substances conviction where amendment made offense a wobbler instead of a straight felony); *People v. Rossi* (1976) 18 Cal.3d 295, 298 [134 Cal.Rptr. 64, 555 P.2d 1313] (reversing oral copulation conviction after legislative amendment rendered the defendant's conduct non-criminal); *People v. Babylon* (1985) 39 Cal.3d 719, 721–722 [216 Cal.Rptr. 123, 702 P.2d 205] (reversing television piracy convictions where conduct no longer illegal under amendment enacted while appeal pending); *People v. Nasalga* (1996) 12 Cal.4th 784, 787 [50 Cal.Rptr.2d 88, 910 P.2d 1380] (defendant entitled to shorter sentencing enhancement under legislative amendment increasing the minimum value of stolen property required for longer enhancement to apply); *People v. Trippet* (1997) 56 Cal.App.4th 1532, 1536, 1548–1549 [66 Cal.Rptr.2d 559] (reversing for limited retrial as to whether medicinal marijuana initiative provided valid defense to the defendant's marijuana possession conviction); *People v. Urziceanu* (2005) 132 Cal.App.4th 747, 783–786 [33 Cal.Rptr.3d 859] (reversing for new trial to allow the defendant to argue that legislative amendments related to medicinal marijuana provided a valid defense to conspiracy to possess marijuana for sale charge).

the criminal law." ' " (*Brown*, at p. 323, quoting *Estrada, supra*, 63 Cal.2d at p. 745, italics added by *Brown*.)

Proposition 57 is distinguishable in two respects from the laws at issue in cases applying the *Estrada* rule. First, Proposition 57 does not expressly mitigate the penalty for any particular crime. Instead, it amends the Welfare and Institutions Code to create a presumption that all individuals under the age of 18 come within the jurisdiction of the juvenile court (Welf. & Inst. Code, § 602), and provides a procedural method for prosecutors to move to transfer a juvenile case to adult court (Welf. & Inst. Code, § 707, subd. (a)(1)). We acknowledge that the amendments may have the effect of reducing the punishment in some cases because, unlike adult court sentences, the longest that juvenile court jurisdiction generally extends is until the juvenile offender is 25 years old. (Welf. & Inst. Code, § 607, subd. (b).) But, as the *Brown* court reasoned when reviewing the amendments to section 4019, the *Estrada* rule is not applicable to any amendment that *may* reduce a punishment. Instead, the *Estrada* rule is "specifically directed to a statute that represents ' "a legislative mitigation of the *penalty for a particular crime*." ' " (*Brown, supra*, 54 Cal.4th at p. 325, italics added by *Brown*.)

Second, Proposition 57 provides no certainty that a minor will actually receive a mitigated penalty because juvenile courts have discretion under Proposition 57 to transfer juvenile cases to adult court. (Welf. & Inst. Code, § 707, subd. (a)(2).) If a case is transferred to adult court, the penalty for all offenses will be the same as they were before Proposition 57.

Given these distinctions, we find that applying the *Estrada* rule to Proposition 57 would expand that rule in such a manner as to risk swallowing the general section 3 presumption that legislation is intended to apply prospectively. (*Brown, supra*, 54 Cal.4th at pp. 324–325.)

*People v. Francis, supra*, 71 Cal.2d 66 relied on by Ramirez, is distinguishable. Francis was convicted of committing a felony drug offense. While his case was pending on appeal, the statute prohibiting that drug offense was amended to change it from a straight felony to a wobbler that could be charged as a felony or a misdemeanor. The *Francis* court determined that the *Estrada* rule applied. (*Id*. at pp. 75–78.) The court reasoned that while the amendment did not guarantee Francis a lower sentence, making the crime punishable as a misdemeanor showed a legislative intent that punishing the offense as a felony might be too severe in certain cases. (*Francis*, at p. 76.)

*Francis* is distinguishable because it involved a legislative mitigation of the potential punishment for a specific crime. Where, as under Proposition 57, the

potential benefit inures to a class of offenders based on their age rather than on the offenses they commit, the inference that voters deemed the entire Penal Code unduly severe when applied to minors is too attenuated to support application of the *Estrada* rule.[30]

Our conclusion that the *Estrada* rule does not apply is consistent with a recent decision interpreting Proposition 57. (*Cervantes, supra,* 9 Cal.App.5th 569.) Cervantes (who was 14 years old) was charged as an adult before Proposition 57 and convicted of several charges, including attempted murder and torture. (*Cervantes,* at pp. 582–584.) Proposition 57 passed while his case was pending on appeal. The Court of Appeal rejected Cervantes's argument that Proposition 57 should apply retroactively to him under the *Estrada* rule, reasoning that while Proposition 57 "will have a substantive impact on time in custody in some cases—sometimes a big impact—the transfer procedure required under Welfare and Institutions Code section 707 does not resemble the clear-cut reduction in penalty involved in *Estrada.*" (*Cervantes,* at p. 601.) The court observed that Proposition 57 "may or may not in some attenuated way affect punishment, but it is not a direct reduction in penalty as required for retroactivity under *Estrada.*" (*Cervantes,* at p. 602.)

### D. *No Equal Protection Violation*

Ramirez argues that not applying Proposition 57 retroactively to his case would violate his state and federal constitutional rights to equal protection. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).)

### 1. *Standard of Review*

■ The concept of equal protection recognizes that individuals who are similarly situated should be treated equally, unless there is a justification for the differential treatment. (*Brown, supra,* 54 Cal.4th at p. 328.) The first step in an equal protection challenge is demonstrating that the state adopted a classification that affects two or more similarly situated groups in an unequal way. (*Ibid.*) That "initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654].)

---

[30] In concluding that the *Estrada* rule does not apply to Ramirez's case, we express no opinion on the possible applicability of Proposition 57 to cases where trial had not commenced before the initiative took effect. (See *People v. Superior Court (Lara)* (2017) 9 Cal.App.5th 753, 776–779 [215 Cal.Rptr.3d 456] [finding juveniles charged in adult court by direct filing before Prop. 57 are entitled to fitness hearings before trials commence]; *People v. Cervantes* (2017) 9 Cal.App.5th 569 [215 Cal.Rptr.3d 174] (*Cervantes*) [finding juvenile convicted in adult court after direct filing was entitled to a fitness hearing on remand before retrial of counts the Court of Appeal reversed].)

The second step is determining whether there is a sufficient justification for the unequal treatment. The level of justification needed is based on the right implicated. When the disparity implicates a suspect class or a fundamental right, strict scrutiny applies. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836 [16 Cal.Rptr.3d 420, 94 P.3d 551] (*Wilkinson*).) When no suspect class or fundamental right is involved, the challenger must demonstrate that the law is not rationally related to any legitimate government purpose. (*People v. Turnage* (2012) 55 Cal.4th 62, 74 [144 Cal.Rptr.3d 489, 281 P.3d 464] (*Turnage*).) "In other words, the legislation survives constitutional scrutiny as long as there is ' "any reasonably conceivable state of facts that could provide a rational basis for the classification." ' " (*Ibid.*)

2. *Ramirez Is Similarly Situated with Juveniles Benefiting from Proposition 57*

Ramirez is similarly situated with another class for purposes of his challenge to Proposition 57. The two classes are distinguished by whether trial had commenced before Proposition 57's effective date.[31] Ramirez falls within the class of individuals whose trials had already commenced. He is similarly situated with a class of hypothetical individuals who are 16 or 17 years old and accused of crimes that could result in transfer to adult court, but whose trials had not commenced before Proposition 57 became effective.

3. *There Is a Rational Basis for Ramirez's Differential Treatment*

Having determined that Ramirez is similarly situated with another class of individuals, we must decide whether there is a justification for the differential treatment caused by prospective application of Proposition 57. But first we must decide which standard of review applies: strict scrutiny or rational basis.

Ramirez argues both that strict scrutiny applies because Proposition 57 implicates Ramirez's fundamental liberty interest (citing *People v. Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375] (*Olivas*)), and that the distinction cannot even survive rational basis review.

*Olivas* involved a challenge to a law that allowed adult misdemeanants who were under 21 years old to be tried in adult court and then remanded to

---

[31] We acknowledge that when remanding the case for possible retrial or resentencing, the *Cervantes* court found that the distinguishing event for application of Proposition 57 was sentencing rather than commencement of trial. (*Cervantes, supra,* 9 Cal.App.5th 612 ["[B]e-ginning with the effective date of Prop[.] 57, a juvenile felon may not be 'sentenced in adult court' without a prior transfer hearing under Welfare and Institutions Code section 707, subdivision (a), if he or she so requests."].) We explain in footnote 32, *post,* why defining the two classes based on sentencing rather than the commencement of trial would not change our equal protection analysis here.

the California Youth Authority. (*Olivas, supra*, 17 Cal.3d at p. 239.) The California Youth Authority could retain an individual until he or she turned 23 years old. (*Id.* at p. 241.) Olivas (who was 19 years old when he was arrested) was convicted of a misdemeanor that had a maximum sentence of six months, meaning that under the challenged law he faced a "potential period of confinement several times longer than the longest jail term which might have been imposed." (*Id.* at pp. 239–242.) Because his challenge implicated a fundamental liberty interest, the Supreme Court concluded that strict scrutiny applied. (*Id.* at pp. 247–251.)

Ramirez essentially argues that strict scrutiny applies here because he is potentially subject to a longer period of incarceration than those to whom Proposition 57 applies. Though *Olivas* could be interpreted to require strict scrutiny in any case involving penal statutes authorizing different sentences, "*Olivas* properly has not been read so broadly." (*Wilkinson, supra*, 33 Cal.4th at pp. 837–838 [applying rational basis to equal protection challenge to two statutes prohibiting battery against custodial officers where it was possible that statute prohibiting battery without injury could be punished more severely than statute prohibiting battery with an injury]; accord, *People v. Owens* (1997) 59 Cal.App.4th 798, 802 [69 Cal.Rptr.2d 428] ["California courts have never accepted the general proposition that 'all criminal laws, because they may result in a defendant's incarceration, are perforce subject to strict judicial scrutiny.' "].) In a similar context, the Ninth Circuit concluded that the rational basis standard applied to a challenge brought by a defendant sentenced under Washington's indeterminate sentencing scheme who argued that he had been denied equal protection by not having that state's later-enacted determinate sentencing scheme applied to his case. (*Foster v. Washington State Bd. of Prison Terms and Parole* (9th Cir. 1989) 878 F.2d 1233, 1235.)

Ramirez's prosecution, conviction, and sentencing in adult court were all proper under the laws in place at the time of those events. Proposition 57 differentiates between people based on the timing of their prosecution rather than on any suspect classification. And Ramirez had no vested liberty interest " ' "in a specific term of imprisonment or in the designation a particular crime receives." ' " (*Turnage, supra*, 55 Cal.4th at p. 74.) We find that the rational basis standard applies.

■ Ramirez argues that the differential treatment he receives "bears no rational relationship to [Proposition] 57's 'objective.' " But the rational basis standard does not focus solely on a law's stated objective. It allows for " ' "any reasonably conceivable state of facts that could provide a rational basis for the classification." ' " (*Turnage, supra*, 55 Cal.4th at p. 74.) The voters could rationally conclude that applying Proposition 57 prospectively would serve the legitimate purpose of not overwhelming the juvenile courts

with requests for fitness hearings by those who had already been convicted in adult court for crimes committed as juveniles. (E.g., *Talley v. Municipal Court* (1978) 87 Cal.App.3d 109, 114–116 [150 Cal.Rptr. 743] [finding no equal protection violation in prospective-only application of alcohol treatment program that bypassed license suspension because differential treatment rationally related to law's purpose of " 'prevent[ing] the courts and programs in each county from being overburdened at the commencement of the implementation of this article' "].)

The voters could also rationally conclude that applying Proposition 57 prospectively was rationally related to the legitimate government purpose of assuring that " 'penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written' " when the defendant committed the crime and was tried for that offense. (*People v. Floyd* (2003) 31 Cal.4th 179, 188, 190–191 [1 Cal.Rptr.3d 885, 72 P.3d 820] [rejecting equal protection challenge to prospective-only application of Prop. 36, the Substance Abuse and Crime Prevention Act of 2000, which guaranteed probation for individuals convicted of nonviolent possession offenses, subject to certain disqualifying circumstances].) We acknowledge that the penal laws will not maintain their desired deterrent effect in *all* cases because Proposition 57 likely applies to juveniles who committed crimes before Proposition 57 but who were not prosecuted until after its effective date. But a " 'classification is not arbitrary or irrational simply because there is an "imperfect fit between means and ends" ' [citation], or 'because it may be "to some extent both underinclusive and overinclusive." ' " (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 887 [183 Cal.Rptr.3d 96, 341 P.3d 1075].)

More fundamentally, the federal Constitution " 'does not forbid . . . statutory changes to have a beginning and thus to discriminate between the rights of an earlier and later time.' " (*Califano v. Webster* (1977) 430 U.S. 313, 314–316, 321 [51 L.Ed.2d 360, 97 S.Ct. 1192] [rejecting equal protection challenge to an amendment to the Social Security Act (42 U.S.C. § 301 et seq.) that improved a retirement benefit calculation but applied only prospectively; plaintiff had argued retroactive application was required to prevent discrimination based on date of birth].)

Because there is a rational basis for prospective-only application of Proposition 57, Ramirez's equal protection challenge fails.[32]

---

[32] Even assuming, consistent with *Cervantes*, that the two classes are distinguished by whether sentencing had occurred before Proposition 57's effective date (see *Cervantes, supra*, 9 Cal.App.5th at p. 612), our equal protection analysis would not change. Applying Proposition 57 to juveniles who had been found guilty in adult court before Proposition 57 but who were not *sentenced* until after the initiative became effective would slightly increase the class of people who benefit from Proposition 57. But the voters could still rationally conclude that applying

### E. *No Due Process Violation*

Ramirez argues that not applying Proposition 57 retroactively to his case would violate his federal constitutional right to due process. He cites a single case to support that proposition, *Kent v. United States* (1966) 383 U.S. 541 [16 L.Ed.2d 84, 86 S.Ct. 1045] (*Kent*).

*Kent* involved what the Supreme Court characterized as "a number of disturbing questions concerning the administration . . . of the District of Columbia laws relating to juveniles." (*Kent, supra*, 383 U.S. at pp. 542–543.) When Kent was 16 years old, he was apprehended after his fingerprints were found in the apartment of a woman who had been raped. Police interrogated Kent for several hours, delivered him to a "Receiving Home for Children" for the night, and then interrogated him for several more hours the next day. (*Id.* at pp. 543–544.) Kent's mother retained counsel for Kent. His counsel filed motions requesting a hearing on the juvenile court's apparent intention to transfer Kent to adult court and seeking access to Kent's juvenile court file. The juvenile court file contained a report that discussed the possibility of Kent having a mental illness. (*Id.* at pp. 544–546.) Without holding a hearing, the juvenile court summarily ordered Kent's case transferred to adult court, finding that "after 'full investigation, I do hereby waive' " the juvenile court's jurisdiction. (*Id.* at p. 546.) Kent was charged in adult court with residential burglary, robbery, and rape. He was found not guilty by reason of insanity of rape, but was found guilty of the remaining charges. (*Id.* at pp. 548, 550.)

The Supreme Court found that the juvenile court violated Kent's rights to due process and the effective assistance of counsel when it summarily transferred his case to adult court. (*Kent, supra*, 383 U.S. at pp. 557, 561–562.) The statute at issue stated that the juvenile judge "may, after full investigation, waive jurisdiction and order such child held for trial under the regular procedure of the court which would have jurisdiction of such offense if committed by an adult." (*Id.* at pp. 547–548.) The court found that "the statute read in the context of constitutional principles relating to due process and the assistance of counsel" required the juvenile court to provide a hearing, assistance of counsel (including providing the attorney access to juvenile court files), and a statement of reasons to support its decision. (*Id.* at pp. 557, 561–562.)

We find *Kent* readily distinguishable. *Kent* did not involve review of whether a law that had taken effect after a conviction should be applied

---

Proposition 57 only to that slightly larger class of juveniles would serve the legitimate government interest of preventing juvenile courts from being overwhelmed with requests for fitness hearings by those who had already been convicted *and sentenced* in adult court for crimes they committed as juveniles.

retroactively. And the Supreme Court was careful to note that it was deciding the case based on its interpretation of the statute at issue there, read in the context of constitutional principles. (*Kent, supra,* 383 U.S. at p. 557.) Ramirez does not argue that the trial court here violated any procedural statute in effect when he was prosecuted.

■ Over a century ago, the United States Supreme Court concluded that for purposes of due process, "the Fourteenth Amendment does not forbid statutes and statutory changes to have a beginning and thus to discriminate between the rights of an earlier and later time." (*Sperry & Hutchinson Co. v. Rhodes* (1911) 220 U.S. 502, 505 [55 L. Ed. 561, 31 S.Ct. 490] [denying due process challenge to new law prohibiting use of person's picture in advertising without consent].) Ramirez has failed to demonstrate any due process violation.[33]

## IV. DISPOSITION

The superior court is directed to prepare a new abstract of judgment for each defendant to note a 15-year minimum parole eligibility date based on Penal Code section 186.22, subdivision (b)(5), and to forward those abstracts to the Department of Corrections and Rehabilitation. As so modified, the judgments are affirmed.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.

Petitions for a rehearing were denied April 20, 2017, and the opinion was modified to read as printed above. The petition of appellant Juan Ramirez for review by the Supreme Court was granted July 12, 2017, S241647.

---

[33] Ramirez also argues that, even if his constitutional arguments fail, Proposition 57 should be construed as retroactive to avoid serious and doubtful constitutional questions. "If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers." (*Miller v. Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.3d 297].) This rule of statutory construction is inapplicable here. Construing Proposition 57 as prospective-only does not raise "serious and doubtful" constitutional issues, as our analysis of those constitutional issues demonstrates. Hence, no presumption arises that the voters intended to avoid these issues.